Filed 7/5/24  P. v. Jones CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>JOSEPH WAYNE JONES<br><br>      Defendant and Appellant. | B328751<br><br>(Los Angeles County<br> Super. Ct. No. BA292350) |

APPEAL from an order of the Superior Court of Los Angeles County, H. Clay Jacke II, Judge.  Affirmed.

G. Martin Velez, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Nicholas J. Webster and Amanda V. Lopez, Deputies Attorney General, for Plaintiff and Respondent.

In 2011, a jury convicted defendant and appellant Joseph Wayne Jones of one count of first degree murder (Pen. Code, § 187, subd. (a)), four counts of attempted willful, premeditated murder (*id.*, §§ 664, 187, subd. (a)), and one count of shooting at an inhabited dwelling (*id.*, § 246). In 2019, defendant filed a petition to vacate his murder conviction and resentence on any remaining counts under former Penal Code section 1170.95 (now § 1172.6).[1] The trial court summarily denied the petition.

On appeal, defendant contends the trial court erred by denying his petition without issuing an order to show cause. The People contend, and we agree, that defendant is ineligible for relief as a matter of law. We affirm.

## BACKGROUND

### A.    Factual Background[2]

1.    *The Shootings on 84th Street and South Halldale Avenue*

Lester Turner and Andre Turner lived in a home on 84th Street in the City of Los Angeles with their grandfather, John Turner.[3] Lester and Andre were members of the Eight Trey Gangster Crips gang.

---

[1]    Subsequent references to statutes are to the Penal Code. Effective June 30, 2022, former section 1170.95 was renumbered 1172.6 without substantive change. (Stats. 2022, ch. 58, § 10.)

[2]    The following summary is taken from our prior opinion resolving defendant's direct appeal to provide context.

[3]    For ease of reading, we use the first names of the Turner family members and other individuals sharing the same last name. We intend no disrespect.

In the evening of October 20, 2005, John was sitting in a room inside the home facing the street. Lester, Andre, and a friend, Kevin Ingram, were in the driveway working on Lester's car.

Three African American men in their early 20's and wearing hoodies drove a grey pickup truck down the street, got out of the truck, and walked toward the Turner residence. Unable to see the men's faces, Andre said, "What's up?," and the men replied, "What's up?," before shooting at the house. One of the men used a rifle and the others used handguns. Numerous shots were fired, but no one was hit. After the shooting, the three men ran back to their truck and drove away.

Around five minutes later, another shooting occurred over a mile away at the home of Robin Sanders on Halldale Avenue. Robin was inside her home with her nephew, Thomas Maleik Sanders. Thomas's friend, Paul Fry, had driven Thomas to Robin's house and was waiting in his car in the driveway. Fry was a member of the Bounty Hunter Bloods gang. Thomas was not a gang member.

After finishing his laundry, Thomas got into Fry's car with the windows rolled down. When Fry started the car, an African American man ran up to Fry's window and pointed a handgun at him. Fry heard two or three clicks, but the gun did not fire. The man ran away toward the street.

As Fry tried to back his car out of the driveway, he looked through the passenger-side window and saw a different man several houses down, wearing a hoodie and holding an AK-47 rifle. The man fired the rifle several times. Fry tried to drive away but was shot three times. His car spun out of control and ended in a nearby yard. A grey pickup truck stopped near Fry's

3

car.  Several occupants looked at Fry and Thomas and drove away.  Thomas was shot numerous times and died as a result.

> 2. *Police Investigation and Defendant's Interviews*

On October 23, 2005, two detectives went to the Turner residence to interview Andre.  As they passed through the living room, one detective saw a young Black man motion to Andre not to say anything to the police.  Andre identified Damien Watts (also known as "Chopper") in a six-pack photographic lineup as a Rollin' 60's Neighborhood gang member he knew from jail.  Andre did not identify the shooter.[4]  In a follow-up interview later that evening, Andre said he knew "Chopper from 60's" shot at his house, but stated he would not testify because he was not a snitch.  Andre denied saying this at trial.

Defendant was also interviewed on October 23, 2005.  He identified Watts and Jason Weldon from six-pack photographic lineups and stated Watts and Weldon had told him Watts fired an AK-47 at Eight Trey Gangster Crips and at the Turner residence.  Defendant stated that Weldon had borrowed his pickup truck and drove or rode in it as a passenger on October 20, 2005.  Defendant identified Anthony Padilla as the driver or additional passenger in the truck.

In a subsequent interview, defendant admitted he was a passenger in the truck during both shootings.  He reported that Weldon came to pick him up at his house because "one of the homies had got shot."  During their conversation, another man, Derek Brown, called defendant to report someone had threatened

---

[4]   Fred Johnson lived across the street from the Turners and witnessed the shooting.  During a live lineup in December 2005 and later at trial, Johnson identified Watts as the man who shot the rifle.

4

his father.  Defendant and Weldon picked up Brown and Watts and decided to get an AK-47 rifle.

Brown, Weldon, and Watts told another gang member they were going to "put in work" by robbing someone and "shoot[ing] up something."  Defendant drove them to pick up Padilla, who then drove the group to the Turner residence where Watts, Weldon, and Brown shot at the house.  Padilla had difficulty driving the truck.  Defendant took the wheel and drove.  After the Turner shooting, defendant thought they would go home but "they don't want to listen."

When the men drove by the Sanders residence, defendant and Brown told the others that Sanders and Fry were not gang bangers.  Watts insisted on stopping and getting out of the truck.  Defendant stated, "I told them, . . . that dude [Sanders] is innocent.  I knew them dudes were no gang bangers."

3.    *Gang Evidence*

Detective David Ross testified about the use of gang monikers, how to join a gang, and the importance of territory to a gang.  He also explained the concept of putting in work, the best example of which was shooting at rival gang members.

Detective Ross knew that defendant ("Capo") and Watts ("Chopper") were members of the Rollin' 60's Neighborhood Crips gang.  One of the gang's rivals was the Eight Trey Gangster Crips.  Both shootings in this case occurred in Eight Trey Gangster Crips territory.  Based on a hypothetical mirroring the facts of both shootings, Detective Ross opined both were committed for the benefit of, at the direction of, or in association with the Rollin' 60's Neighborhood Crips gang to promote or further its criminal conduct.

5

## B. Procedural Background

Defendant was tried alone in August 2011. A jury convicted him of one count of first degree murder (§ 187, subd. (a)), four counts of willful, deliberate, and premeditated attempted murder (§§ 664, 187, subd. (a)), and one count of shooting at an inhabited dwelling (§ 246). The jury found true the allegations each charged offense was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(A)). On the murder and attempted murder counts, the jury found true the allegations a principal personally and intentionally discharged a firearm (§ 12022.53, subd. (d)). In addition, the jury found defendant intentionally murdered Thomas while being an active participant in a criminal street gang (§ 190.2, subd. (a)(22)). The trial court sentenced defendant to an overall term of life imprisonment without the possibility of parole plus four life terms and a consecutive term of 110 years to life.

A panel of this court affirmed defendant's convictions in *People v. Jones* (Mar. 29, 2013, B236850) [nonpub. opn.]. This court rejected defendant's challenge to the sufficiency of evidence supporting the gang-murder special circumstance finding (§ 190.2, subd. (a)(22)). (*Id.* at p. 12.) "Viewing, as we must, the evidence in the light most favorable to the judgment," this court found "sufficient evidence to support the jury's special circumstance findings." (*Ibid.*)

In February 2022, defendant filed a resentencing petition under former section 1170.95, seeking resentencing on his murder conviction. The trial court appointed counsel and received additional briefing by the parties. Following a prima facie hearing, the court summarily denied the petition, relying on the court file (including the jury instructions and verdicts) and

6

finding defendant ineligible for relief as a matter of law. Defendant timely appealed.

## DISCUSSION

### A. Governing Law: Section 1172.6

Through Senate Bill No. 1437 (Stats. 2018, ch. 1015, § 1) (S.B. 1437), the Legislature clarified the felony murder rule and eliminated the natural and probable consequences doctrine to ensure any murder conviction and attached sentence is commensurate with individual culpability. (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843; *People v. Lewis* (2021) 11 Cal.5th 952, 957, 971 (*Lewis*); accord, § 189, subd. (e).) The Legislature also added former section 1170.95 (now section 1172.6), pursuant to which individuals convicted of felony murder or murder under the natural and probable consequences doctrine may petition for vacatur of their convictions and resentencing. (§ 1172.6, subd. (a).)

Within 60 days after service of a facially compliant petition, the prosecutor must file and serve a response, to which the petitioner may file and serve a reply. (§ 1172.6, subd. (c).) Following this briefing period, the court "shall hold a hearing to determine whether the petitioner has made a prima facie case for relief." (*Ibid.*) If the petition and record in the case establish conclusively the petitioner's ineligibility for relief as a matter of law, the trial court may summarily deny the petition. (See *People v. Strong* (2022) 13 Cal.5th 698, 708; *Lewis*, *supra*, 11 Cal.5th at pp. 970–972; § 1172.6, subd. (c).)

Persons liable for murder under current law include actual killers, aiders and abettors who act with intent to kill, or major

7

participants in the underlying felony who act with reckless indifference to human life.  (§ 189, subd. (e)(3).)

We review de novo whether the trial court properly denied a section 1172.6 petition without issuing an order to show cause.  (*People v. Williams* (2022) 86 Cal.App.5th 1244, 1251.)

**B.  Defendant Was Ineligible for Relief as a Matter of Law**

Defendant contends the trial court erred by summarily denying his petition.  His contention is premised on the jury instructions at trial and whether they permitted his conviction for murder on an imputed malice theory of liability.  We conclude they did not.

The record of conviction demonstrates defendant was convicted of murder as either a direct perpetrator or an aider and abettor to that crime.  The jury instructions and verdict prove this conviction as a matter of law.

The jury was instructed on the elements of murder under CALCRIM No. 520, which required the prosecution to prove beyond a reasonable doubt that "1. The defendant committed an act that caused the death of another person; [¶] AND [¶] 2. When the defendant acted, he had a state of mind called malice aforethought."  CALCRIM No. 520 defined both "kinds of malice aforethought, express malice and implied malice," while CALCRIM No. 521 further instructed the jury to "decide whether the murder [is] of the first or second degree."  The instructions clarified defendant was "prosecuted for first degree murder under the theory the murder was willful, deliberate, and premeditated. The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with

8

premeditation." The instructions defined "willfully" to mean defendant "intended to kill" and placed on the People "the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime."

The jury also received instruction on the special circumstance allegation (§ 190.2, subd. (a)(22); CALCRIM Nos. 700, 702) that defendant intentionally murdered Thomas while being an active participant in a criminal street gang. The instruction informed the jury that if it found defendant "guilty of first degree murder," it had to decide whether the People met their burden of proving the special circumstance allegation true beyond a reasonable doubt. To prove this allegation if defendant was "not the actual killer" but was "guilty of first degree murder as an aider and abettor," the People had to prove "that the defendant acted with the intent to kill."

The jury also received instruction on the general principles of aiding and abetting (CALCRIM No. 400), which informed the jury a person may be guilty of a crime by either personally committing the crime (defined as "a perpetrator") or aiding and abetting the perpetrator of the crime. As to the theory of aiding and abetting, specifically, the jury was instructed with CALCRIM No. 401, which provided in relevant part:

> "To prove that [the] defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:
> "1. The perpetrator committed the crime;
> "2. The defendant knew that the perpetrator intended to commit the crime;
> "3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶]

9

"4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

By convicting defendant of first degree murder, the jury necessarily found him guilty as the perpetrator or as an aider and abettor to first degree murder. To find defendant guilty under the latter theory of liability, the instructions required the jury to find defendant knew the perpetrator's unlawful purpose and specifically intended to "aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." In applying these instructions to the count of murder, the jury could only have understood "the crime" as used in the instruction to mean murder. By finding defendant guilty of first degree murder, the jury must also have found defendant intended to kill and, by words or conduct, did in fact aid and abet the commission of murder.

These necessary findings meet the standard of direct aiding and abetting murder under current law. (See *People v. Pacheco* (2022) 76 Cal.App.5th 118, 124 (*Pacheco*) ["Under a direct aider and abettor liability theory, the prosecution must prove the person who is not the actual killer 'engaged in the requisite acts [actus reus] and had the requisite intent [mens rea]' to aid and abet the target crime of murder"].)[5]

---

[5] Our Supreme Court dismissed review in *Pacheco* following its decision in *People v. Curiel* (2023) 15 Cal.5th 433. In light of our

10

As defendant has acknowledged, the jury never received an instruction on felony murder, the natural and probable consequences doctrine, or any target crime on which that doctrine could be based.  (See, e.g., CALCRIM Nos. 401–402, 540A–540C, 548.)  Having received none of these instructions and finding defendant guilty of first degree murder as a perpetrator or direct aider and abettor, the jury necessarily found defendant was the actual killer or acted with malice aforethought and engaged in conduct that did in fact aid and abet the perpetrator's commission of murder.  (Accord, *People v. Cortes* (2022) 75 Cal.App.5th 198, 205–206 (*Cortes*); *People v. Harden* (2022) 81 Cal.App.5th 45, 52–53; *People v. Estrada* (2022) 77 Cal.App.5th 941, 946.)

Defendant relies on *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*), for the proposition the jury could have imputed malice on him based entirely on his participation in the shooting culminating in Thomas's death.  Defendant's reliance is misplaced.  In *Langi*, a jury convicted the defendant of second degree murder in connection with the beating death of a robbery victim.  (*Id.* at p. 976.)  The robbery victim fell and struck his head after someone in a group that included the defendant punched the victim "*directly in the face.*"  (*Ibid.*, original italics.)

"As the case was tried, the jury could have found [Langi] guilty as an aider and abettor even if it found that someone else threw the fatal punch.  The jury was not required to find, and did not necessarily find, that it was [Langi] who threw that punch.  Read with the caution dictated by *Lewis*, the prior opinion [and

<hr />

conclusion above, we need not (and do not) consider defendant's alternative argument under *Pacheco* concerning the jury's true finding under section 190.2, subdivision (a)(22).

11

jury instructions do] not conclusively establish that [Langi] was convicted as the actual killer." (*Langi*, *supra*, 73 Cal.App.5th at p. 980.)

Absent any finding by the jury that Langi was the actual killer, the *Langi* court reviewed the jury instructions comprising part of Langi's record of conviction. (*Langi*, *supra*, 73 Cal.App.5th at pp. 980–981.) In its review, the court found Langi's conviction was based on two instructions "of central significance" to its analysis: (1) a second degree murder instruction (CALJIC No. 8.31), and (2) general principles of aiding and abetting (CALJIC No. 3.01). (*Id.* at p. 981.) As Langi's conviction was for second degree murder, the court found CALJIC No. 8.31 permitted a conviction insofar the perpetrator deliberately performed a fatal act (a punch) "with knowledge of the danger to, and with conscious disregard for, human life," and did not require finding the perpetrator's purpose was to kill the victim. (*Id.* at pp. 981–982.) For the jury to convict the defendant as an aider and abettor of second degree murder, it could have found Langi "need only have intended to encourage the perpetrator's intentional act—in this case, punching [the victim]—whether or not [Langi] intended to aid or encourage [the] killing, and whether or not he personally knew of and disregarded the risk of such a killing." (*Id.* at p. 983, fn. omitted.)

Unlike the defendant in *Langi*, defendant in this case was convicted of first degree murder. The instructions on this theory of liability required the finding of express malice as either the perpetrator (the actual killer) or as an aider and abettor. As such, the instructional ambiguities in *Langi* permitting the jury to impute implied malice do not exist in this case. (Accord, *Cortes*, *supra*, 75 Cal.App.5th 198, 205–206 ["Nothing in the

12

charges, the instructions, or the balance of the trial permitted the jury to find Cortes guilty on a theory other than direct aiding and abetting or liability as a perpetrator of murder and attempted murder"].)

## DISPOSITION

The order summarily denying defendant's petition for resentencing is affirmed.

MORI, J

We concur:

COLLINS, Acting P. J.

ZUKIN, J.

13